UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| ANTHONY CARTER, | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. 3:20-cv-312 (SRU) |
| | : |
| JANE DOE, et al., | : |
| Defendants. | : |

# INITIAL REVIEW ORDER RE: AMENDED COMPLAINT

On March 9, 2020, Anthony Carter, a sentenced state prisoner currently confined at MacDougall-Walker Correctional Institution ("MacDougall-Walker"),[1] filed this *pro se* action pursuant to 42 U.S.C. § 1983. *See* Compl., Doc. No. 1. In his initial complaint, Carter alleged that three unnamed employees of the Connecticut Department of Correction ("DOC") violated his Eighth Amendment right to be free from cruel and unusual punishments. More specifically, Carter claimed that those three employees displayed deliberate indifference to Carter's health and safety by temporarily leaving him in an unventilated prison transport van on two separate occasions—for 20-to-30 minutes on each occasion—on a hot summer's day in August 2019. As a remedy for that deliberate indifference, Carter sought monetary damages of $82,500 against each defendant. *See id.* at 5.[2]

On initial review, I dismissed without prejudice Carter's complaint because it failed to state a plausible Eighth Amendment claim upon which relief might have been granted. *See* IRO, Doc. No. 16-1, at 6–7. I afforded Carter an opportunity to file an amended complaint to correct the deficiencies that I identified. *See id.* at 7–8. On November 18, 2020, Carter filed that

---

[1] Pursuant to Fed. R. Evid. 201(b), I take judicial notice of the fact that Carter is a sentenced state inmate. *See* Fed. R. Evid. 201(b)(2) (explaining that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *Inmate Information*, CONN. ST. DEP'T OF CORR., http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=188339 (last visited May 27, 2021).

[2] Carter sought $75,000 against each defendant in "punitive damages" and $7,500 against each defendant in "nominal damages." Compl., Doc. No. 1, at 5.

amended complaint. *See* Am. Compl., Doc. No. 20. Because Carter's amended complaint still fails to state a plausible Eighth Amendment claim, I dismiss it.

I.     **Standard of Review**

Pursuant to 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any portion of those complaints that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

II.    **Factual Background**

On August 20, 2019, a DOC employee ("Doe 1") was driving a transport van to and from various DOC facilities and transferring prisoners among them. *See* Am. Compl., Doc. No. 20, at ¶ 7. Doe 1 picked up Carter at MacDougall-Walker and, eventually, dropped him off at Cheshire Correctional Institution ("Cheshire"). *Id.* Before dropping off Carter at Cheshire, Doe 1 made

2

two stops—one at Hartford Correctional Center ("HCC") and the other at New Haven Correctional Center ("NHCC"). *Id.* at ¶ 8. This case concerns those two stops.

August 20 was a humid day; the temperature was in the mid-80s. *Id.* at ¶ 9. It was hot enough that Doe 1 turned on the air conditioner in the van as she drove to and from each prison. *Id.* Doe 1 stopped at HCC to pick up at least one other prisoner. *Id.* ¶ 10. Before reaching HCC's sally port,[3] Carter asked Doe 1 whether he and the other inmates in the van would be going inside HCC. *Id.* at ¶ 11. Doe 1 said that they would not. *See id.* So, Carter asked Doe 1 to roll down the van's windows so that he and the other inmates in the van could get some air. *Id.* at ¶ 12. Doe 1 did not respond. *Id.*

Instead, after parking the van in HCC's sally port, Doe 1 turned off the ignition, rolled up the windows,[4] exited, and locked the van. *Id.* at ¶ 13. Doe 1 was away for "between twenty to thirty minutes." *Id.* at ¶ 17. In those 20-to-30 minutes, Carter says that he "believed it felt [] like 90+ degrees inside the van." *Id.* at ¶ 14. The hot temperature caused Carter to "experience[] a lack of oxygen," and he thought he might suffocate and die. *Id.* Carter then had "an anxiety/panic attack" that consisted of a "pounding/racing heartbeat, difficulty breathing," and a fear that he would die. *Id.* at ¶ 15. Using breathing techniques, Carter calmed himself down. *Id.* at ¶ 20. In fact, Carter has had panic attacks before, which the DOC knows because Carter's mental health records reflect that. *Id.* at ¶ 18. One of the triggers for Carter's panic attacks is being confined in a hot, enclosed prison van. *Id.* Carter alleges that another DOC employee who was monitoring the HCC sally port via video ("Doe 2") witnessed Doe 1's deliberate

---

[3] A "sally port" is "a secure entryway (as at a prison) that consists of a series of doors or gates." *Sally port*, MERRIAM-WEBSTER, merriam-webster.com/dictionary/sally%20port (last visited May 28, 2021).
[4] Neither Carter nor the other prisoners were able to open the van's windows because they were shackled and handcuffed and because there was a wire mesh cage over the windows. *See* Am. Compl., Doc. No. 20, at ¶ 19.

indifference and did nothing to stop it. *Id.* at ¶¶ 5, 37. No other DOC employee at HCC checked on Carter or the other inmates in the van. *Id.* at ¶ 22.

After Doe 1 returned to the van, she "turned on the van despite calls for her attention, turned on the van radio, pa[i]d attention to her cellphone and drove away." *Id.* at ¶ 21. Doe 1 drove to NHCC and made another stop. *Id.* at ¶ 23. As the van approached NHCC's sally port, Carter asked Doe 1 once more to leave the windows open if she did not intend to remove him or the other inmates from the van; Doe 1 again did not respond. *Id.* at ¶ 24. After parking the van in NHCC's sally port, Doe 1 again turned off the ignition, rolled up the windows, exited, and locked the van. *Id.* at ¶ 25. Carter explains that he "experienced the same circumstances as described" in the HCC stop and incorporates those paragraphs by reference rather than describing in any detail the NHCC stop. *See id.* ¶ 26. Another DOC employee ("Doe 3") was monitoring the NHCC's sally port via video and witnessed Doe 1's deliberate indifference but did nothing to stop it. *Id.* at ¶¶ 6, 38.

After arriving at Cheshire, Carter submitted an inmate request form to the mental health department regarding the above incidents. *Id.* ¶ 27. Two days later (August 22), a mental health provider at Cheshire counseled Carter. *Id.* Carter also filed a grievance and an appeal, neither of which received responses. *Id.* at ¶¶ 28–29. Carter later submitted a complaint to Commissioner Rollin Cook, and Deputy Commissioner Roger Bowles responded that the issue "was reviewed and addressed." *Id.* ¶¶ 33–34.

### III. Discussion

In his amended complaint, Carter contends that Doe 1 was deliberately indifferent to his health and safety in violation of the Eighth Amendment by leaving him in a prison van with the

4

windows rolled up and the air conditioning turned off for two 20-to-30 minute periods[5] when she stopped at HCC and NHCC on August 20, 2019. Carter claims that Doe 2 and Doe 3 were also deliberately indifferent to his health and safety because they saw Doe 1's deliberate indifference, but did nothing to help. Carter's claims fail because they do not plausibly allege an Eighth Amendment violation.

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment imposes certain duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (cleaned up). To state a claim for deliberate indifference under the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[] necessit[y]" or a "substantial risk of serious harm." *Id.* at 834 (cleaned up). To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent; that is, the officials must have known that the plaintiff faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of "mere negligence" is insufficient. *Id.* at 835. Rather, the subjective element

---

[5] Although Carter does not include any facts about his stop at NHCC's sally port, he says that it was identical to his experience at HCC's sally port. *See* Am. Compl., Doc. No. 20, at ¶ 26 (incorporating by reference paragraphs regarding HCC stop). Thus, I treat the amended complaint as alleging that the stop at NHCC's sally port was also 20-to-30 minutes.

requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

A. <u>Risk of Harm to Physical Health</u>

Carter has not alleged a plausible Eighth Amendment claim based on his exposure to "90+ degree[]" temperatures for two periods of 20-to-30 minutes on a single day in the summer of 2019 because those allegations do not satisfy the objective prong of the Eighth Amendment test. To be sure, an inmate's forced, prolonged exposure to extreme temperatures can amount to a constitutional violation. *See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[E]xposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."). There is "no bright-line durational or severity threshold that a deprivation must meet" to amount to a constitutional violation. *Ford v. Aramark,* 2020 WL 377882, at *7 (S.D.N.Y. Jan. 23, 2020) (quoting *Collins v. Fischer*, 2018 WL 1626528, at *7 (S.D.N.Y. Mar. 30, 2018)) (cleaned up). Instead, courts should consider both the "duration and severity of the exposure" in evaluating whether an inmate's exposure to extreme conditions of confinement amount to a constitutional violation. *See Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (announcing that rule in the context of unsanitary conditions of confinement). In general, exposure to extreme temperatures for a relatively short period of time is not objectively serious enough to rise to the level of a constitutional violation. *See Henry v. Doe*, 2020 WL 209091, at *6 (S.D.N.Y. Jan. 10, 2020) ("If the cold is mild, or the exposure is short-term, Courts generally do not find a constitutional violation."); *Clay v. Lee*, 2019 WL 1284290, at *6 (S.D.N.Y. Mar.

20, 2019) ("Where the exposure [to extreme temperatures] is for a short period of time, courts have found no Eighth Amendment violation.").

I am aware of no court that has held an exposure this short and minimal—exposure to "90+ degree[]" temperatures for two 20-to-30 minute periods on the same day—to have amounted to a potential constitutional violation. Instead, cases in which courts have held that a prisoner's constitutional rights were violated based on exposure to extreme temperatures normally involve exposures far longer and more severe than those that Carter alleges here. *See, e.g.*, *Walker*, 717 F.3d at 128 (holding that prisoner stated plausible claim when he alleged, *inter alia*, that, for 28 months, his cell was "so hot during the summer that he had difficulty breathing, and it was so cold during the winter that ice formed inside the cell windows"); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (prisoner stated plausible claim when he was "subject to temperatures near or well below freezing for a five-month period"); *Wingate v. Robert N. Davoren Ctr.*, 2013 WL 4856573, at *3–4 (S.D.N.Y. Sept. 10, 2013) (prisoner stated plausible claim based on week-long exposure to temperatures over 90 degrees that caused "fainting spells, dizzy spells, and trouble breathing").

Further to the point, many courts have held that exposures to extreme temperatures far more serious than those alleged in this case have failed to rise to the level of constitutional violations. *See, e.g.*, *Miller v. Netto*, 2019 WL 4646973, at *9 (D. Conn. Sept. 24, 2019) (no constitutional violation based on pre-trial detainee's "expos[ure] to cold temperatures for at most, nineteen hours"); *Thornton v. Phillips*, 2019 WL 7559630, at *4–6 (E.D. Tex. July 25, 2019) (no constitutional violation when prisoner "was confined in a hot holding cell for two hours" and "in a shower for two hours in hot conditions" that resulted in mild overheating and

7

elevated blood pressure), *report and recommendation adopted*, 2019 WL 5304086 (E.D. Tex. Oct. 21, 2019); *Pagan v. Quiros*, 2014 WL 1057016, at *8 (D. Conn. Mar. 18, 2014) (no constitutional violation when "the temperature in the prison van during" two trips was undoubtedly uncomfortable, but "not sufficiently severe or prolonged enough" to amount to a constitutional violation); *Stevens v. City of New York*, 2011 WL 3251501, at *4 & n.2 (S.D.N.Y. July 22, 2011) (no constitutional violation when plaintiff alleged that he "was housed in a cell with a broken window—which was 'somewhat' covered by a garbage bag" for up to four days in mid-May); *Decker v. Dunbar*, 633 F. Supp. 2d 317, 343 (E.D. Tex. 2008) (no constitutional violation based on prisoner's spending "just under 90 minutes" in an "extremely hot"—the "temperature reached 95 degrees"—holding cell, which caused prisoner dehydration and lightheadedness); *Borges v. McGinnis*, 2007 WL 1232227, at *6 (W.D.N.Y. Apr. 26, 2007) (no constitutional violation when plaintiff had been in a 50-degree cell for three days with only a paper gown, paper slippers, and a thin mattress); *Grant v. Riley*, 1993 WL 485600, at *4 (S.D.N.Y. Nov. 24, 1993) (no constitutional violation when plaintiff "had no coat, bedding or blankets for over nine hours, and [] cold wind blew through the broken windows, which were incompletely covered with loose plastic" for three days in December).

Carter's allegations, taken as true, do not establish an Eighth Amendment violation because they do not assert an objectively serious enough condition of confinement. Carter alleges that, during the stops at HCC and NHCC on August 20, 2019, he was left for 20-to-30 minutes in an enclosed prison van. Carter acknowledges that, before those 20-to-30 minutes, the air conditioning was on. Nevertheless, the temperature in those 20-to-30 minutes reached above 90 degrees, according to Carter, who alleges that he thus experienced a lack of oxygen and

8

difficulty breathing, which triggered a panic attack. However, Carter also alleges that he was able to control his panic attack with breathing techniques. *See* Am. Compl., Doc. No. 20, at ¶ 20 ("The plaintiff . . . used some breathing technique to fend off the attack."). Moreover, Carter does not allege that the "lack of oxygen" caused him to feel dizzy or lose consciousness. Nor does Carter allege that he sought medical treatment from Doe 1 at any time during the trips to HCC or NHCC, or that he sought medical treatment from any provider at Cheshire upon his arrival at that facility.

For those reasons, Carter has not plausibly alleged an Eighth Amendment claim based on a risk of physical harm arising from his exposure to heat on August 20, 2019.

B.  Risk of Harm to Mental Health

To the extent that Carter alleges an Eighth Amendment violation based on a risk of harm to his mental health, that claim also fails because it satisfies neither the objective nor the subjective Eighth Amendment tests. Carter alleges that he suffered two panic attacks—one during each of the van stops at HCC and NHCC. Carter contends that his mental health records reflect that, before August 20, 2019, he had suffered from panic attacks and that at least one attack had been triggered by his confinement in a hot prison van.

Courts in the Second Circuit have recognized that severe anxiety attacks coupled with depression or suicidal thoughts may constitute a serious mental health need. *See, e.g.*, *Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) ("[D]epression combined with severe anxiety attacks or suicide attempts is a serious medical need.") (cleaned up); *Covington v. Westchester Cty. Dep't of Corr.*, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010); *Zimmerman v. Burge*, 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases).

Taking Carter's allegations as true, his panic attack was not severe enough to rise to the level of a constitutional violation, nor was it coupled with depression or suicidal ideation. With respect to the severity of his two panic attacks, Carter concedes that he was able to "fend off the attack[s]" by using breathing techniques. Am. Compl., Doc. No. 20, at ¶ 20. In addition, Carter acknowledges that he merely sat still during the attacks: None of the other inmates in the van was even aware that he had experienced any symptoms. *See id.* With respect to suicidal ideation, Carter never alleges that he had any. To be sure, Cater alleges that he "started to believe that he would die from suffocation." *Id.* at ¶ 14. But that is not a suicidal thought. Finally, Carter alleges that on August 22 (two days later), a mental health staff member at Cheshire counseled him regarding his experience in the enclosed prison van on August 20. *See id.* at ¶ 27. Carter does not assert that he sought or required further mental health treatment for the symptoms of anxiety that he experienced on August 20. Those facts do not suggest that Carter experienced a severe panic attack in the van or that the hot conditions in the prison van exposed him to a substantial risk of harm to his mental health. Thus, Carter has not satisfied the objective component of the Eighth Amendment standard.

Even if Carter had satisfied the Eighth Amendment's objective component, I would still dismiss Carter's claim because it fails to satisfy the Eighth Amendment's subjective component. That is because Carter does not allege that any defendant was (1) aware of a substantial risk of harm to Carter's mental health by confining him in the hot prison van and (2) disregarded that risk. For instance, Carter does not allege that he informed Doe 1 that he had suffered a panic attack or that Doe 1 knew about his history of panic attacks. *See* Am. Compl., Doc. No. 20, at ¶ 18 ("*The DOC* is aware via the plaintiff's mental health records that the plaintiff has

10

panic/anxiety attacks and that one of the triggers are being left in a hot DOC van with the windows rolled all the way up and the vehicle turned off with no ventilation.") (emphasis added). Nor does Carter allege that Does 2 and 3 knew he was suffering a panic attack or about his history of panic attacks. None of the defendants is described as a medical or mental health provider, and there are no facts to suggest that any defendant would have had a reason to review or check Carter's mental health records before August 20.

For those reasons, Carter has not plausibly alleged an Eighth Amendment claim based on a risk of harm to his mental health arising from his exposure to heat on August 20, 2019.

### III. Conclusion

For the foregoing reasons, Carter's Eighth Amendment claims of deliberate indifference to his physical and mental health against Does 1, 2, and 3 are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). Carter's motion inquiring about the status of his amended complaint, doc. no. 21, is **DENIED** as moot. The Clerk is directed to enter judgment for the defendants and to close the case.

It is so ordered.

Dated at Bridgeport, Connecticut this 28th day of May 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge